## CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH

Ernest C. Cutchin

v.

Gordon Harper Harley Davidson
Sales, Inc., and AMF, Inc.

August 3, 1983

Case No. (Law) 11,737

## By JUDGE BERNARD G. BARROW

This is a products liability suit seeking damages for personal injuries arising out of a motorcycle accident. A jury returned verdicts against both the motorcycle's manufacturer and its dealer who have now moved to set aside the verdicts. These motions raise three issues: (1) Was the evidence at trial sufficient for the jury to determine that the alleged defect proximately caused the accident injuring the plaintiff? (2) Was a manufacturer's service bulletin describing the defect admissible into evidence? (3) Did the dealer exclude any warranty to the plaintiff by virtue of a provision in its Bill of Sale? I have concluded that the defendants' motions to set aside the jury verdicts should be denied.

### (1) *Sufficiency of the Evidence*

The accident occurred about 11:30 p.m. on August 31, 1979. The plaintiff, riding his motorcycle, entered a curve to the left and attempted to apply his rear brakes. He discovered that the rear brakes would not

apply. He downshifted the transmission to second gear and applied his front wheel brakes. The rear of the motorcycle "jumped to the right a little bit" and skidded into the left rear corner of a car parked on the right side of the street. The left side of the motorcycle fell to the ground, but not before the plaintiff's body was struck between the motorcycle and the car. He suffered multiple injuries including a crushing injury to his right lower leg which resulted in its amputation approximately three inches below his knee.

The plaintiff had purchased the motorcycle from the defendant, Gordon Harper Harley Davidson Sales, Inc. (Gordon Harper) on April 16, 1979. The motorcycle had been manufactured by the defendant, AMF, Incorporated, trading as Harley-Davidson Motor Company, Inc., (Harley-Davidson).

Between its purchase and the date of the accident the plaintiff experienced problems with the brakes, including the rear brake pedal being hard to push down, squealing of the brakes, and loss of brake fluid. He took it to Gordon Harper for service on several occasions complaining of these problems. The last time was on August 24 when he left the vehicle with Gordon Harper until he picked it up on the morning of the accident. He described the brakes at that time as being still more or less the same, but better than they had been.

The defendants do not dispute that, when viewed in the light most favorable to the plaintiff, there was evidence from which the jury could have concluded that the design of the motorcycle's brake linkage system was unsafe. A bolt, known as the brake pedal stop bolt, was used to adjust the linkage between the motorcycle's rear brake pedal and the hydraulic cylinder which actuated the rear brake. Because of its location and its length, the head of this bolt could contact the metal casing surrounding it.

The plaintiff contends that this prevented the rear brake from applying. The defendants argue that there was insufficient evidence from which the jury could conclude that this occurred and caused the accident.

The plaintiff's expert, a professor of mechanical and aerospace engineering at the University of Virginia, testified that he examined the plaintiff's motorcycle on July 15, 1980, approximately 10½ months after the accident. He found a binding in the motion of the

brake pedal and upon further investigation determined that the brake pedal's stop bolt was rubbing against the casing surrounding it. He observed that a gouge had been worn in the casing as a result of this abrasion.

He concluded that the contact between the bolt and the casing surrounding it could prevent the brakes from applying. He also testified that the movement of the motorcycle's rear wheel to the right immediately prior to the collision was consistent with the rear brake not applying. In his opinion both the length of the bolt and the proximity of its head to the metal casing surrounding it constituted an unsafe design.

The evidence that this unsafe design caused the accident was circumstantial. However, breach of warranty may be established by circumstantial evidence. *Southern States Cooperative, Inc.* v. *Doggett*, 223 Va. 650, 657 (1982). "Proof of facts from which it can be reasonably inferred that an act or circumstance sought to be established occurred or existed is sufficient to authorize submission of the issue to the jury." *Richardson* v. *Lovvorn*, 199 Va. 688, 692-93 (1958).

The plaintiff testified that when he attempted to apply his rear brake he discovered that it would not work. Later, a gouge was found in the sprocket cover where the head of the brake pedal stop bolt had contacted it. An expert testified that this condition could cause the brake to fail to apply and the action of the motorcycle immediately prior to the collision was consistent with a rear brake failure.

An unexpected corroboration of the plaintiff's theory occurred during the trial. A model of the brake assembly constructed by Harley Davidson for purposes of demonstration experienced damage similar to that found in the plaintiff's motorcycle.

After it had been used for demonstration during the trial it was discovered to be developing a gouge on the inside of a transparent plastic sprocket cover installed where the metal one would otherwise have been. This gouge was similar in location to the deeper one found in the plaintiff's motorcycle.

The defendants did not offer any alternative explanation for the failure of the rear brake. Instead, they contended that the rear brake did not fail. Thus, if the jury believed the plaintiff and concluded that his

rear brake failed, there was no other explanation available for the failure other than the alleged defective design.

The metal casing surrounding the stop bolt completely concealed it from view. It could only be seen after disassembled, and its action at the time of the accident can only be inferred from the circumstances of the accident, the physical condition of the metal casing after the accident, and the design of the mechanical parts involved.

The gouge in the metal casing was not discovered until 10½ months after the accident. However, the motorcycle was inoperable after the accident, was placed in a truck and carried to the plaintiff's home where it was stored in the plaintiff's garage. These were facts which the jury heard and could consider in determining what weight to give to the expert's observations.

In viewing the evidence in the light most favorable to the plaintiff, there was evidence of circumstances from which the jury could reasonably infer that the defects in design of the brake assembly caused the plaintiff's accident. Therefore, there is sufficient evidence for the jury to determine that the defect proximately caused the accident injuring the plaintiff, and the motion to set aside the verdict on this basis should be denied.

### (2) *Admissibility of Service Bulletin*

After the plaintiff had testified describing the circumstances of the accident and after the plaintiff's expert had described the gouge he found in the metal casing surrounding the stop bolt and the effect of the stop bolt contacting the metal casing would have on the application of the rear brake, the plaintiff offered and the court admitted into evidence plaintiff's Exhibit # 42. This is a service bulletin dated June 29, 1979, issued by Harley Davidson relating to the rear brake pedal stop bolt jamnut. This jamnut screws onto the threads of the stop bolt and is used to hold it in place after the stop bolt has been adjusted. To adjust the stop bolt the jamnut is first loosened which permits the stop bolt to be turned. After the stop bolt is adjusted the jamnut is then tightened again which prevents the stop bolt from turning.

The service bulletin stated that between March 30, 1979, and April 19, 1979, jamnuts on certain motorcycles produced during that period may not have been securely

tightened at the time of factory assembly. The service bulletin pointed out that this "could allow the bolt to unscrew from the pedal shaft arm and allow the bolt head to contact the lower inside edge of the sprocket cover, possibly locking the rear brake in the applied position or prevent [sic] the rear brake pedal from being applied."

The plaintiff's motorcycle was not made during that period of time described and it was not one of those motorcycles identified by number in the service bulletin; however, it was the same model of motorcycle as described in the service bulletin. The service bulletin was an admission by Harley Davidson that the stop bolt head on this model could contact the lower inside edge of the sprocket cover and prevent the rear brake pedal from being applied.

The defendants contend that since the plaintiff's motorcycle was not identified in the service bulletin and was not produced during the period described, the document should not be admitted. However, the service bulletin was not offered to show that the vehicle had been recalled. In fact all of the language in the service bulletin, except that which described the condition involved and identified the motorcycles, was deleted before it was presented to the jury.

The document was an admission by Harley Davidson that the stop bolt could unscrew sufficiently from its position to contact the sprocket cover which in turn could prevent the rear brake pedal from being applied. The plaintiff's motorcycle was the same model as described by the service bulletin. Its parts and design were the same. At no time did either of the defendants contend or suggest that the effect of the stop bolt striking the sprocket cover was different on the plaintiff's motorcycle than it was on the same model described in the service bulletin.

The defendants also contend that it was not applicable since there was no evidence of a loose jamnut involved in the plaintiff's accident. However, the admission in the service bulletin that the brake pedal stop bolt could, because of its length and proximity, strike the sprocket cover and that this could prevent the rear brake from applying was still relevant. Even a tightly screwed jamnut would not deter this if the brake pedal stop bolt were adjusted to a length permitting it.

Finally, the plaintiffs also contend that public policy prohibits the admission of a document of this nature. They refer to authority that compares the use of a recall letter to evidence of subsequent repairs. Allowing the introduction of recall letters into evidence in products liability cases might inhibit the issuance of such letters which would be contrary to public policy.

Nevertheless, recall letters are admissible to show the presence of a defect while the product was under the control of the manufacturer. *Harley-Davidson Motor Co., Inc.* v. *Daniel*, 260 S.E.2d 20 (Ga. 1979); *Manieri* v. *Volkswagenwerk A. G.*, 376 A.2d 1317 (N.J. 1977); *Annot.*, 84 A.L.R.3d 1220 (1978).

The service bulletin was not admitted into evidence until after independent evidence of the existence of the design defect and its relationship to the accident was presented. It supported the plaintiff's contention that a design defect did exist and that it proximately caused the plaintiff's accident.

It might be noted that this was not a recall notice as such, but was described merely as a service bulletin. More importantly, since it did not specifically include the plaintiff's motorcycle by number or identify it as one of those motorcycles effected, public policy is not furthered by its exclusion. The admission of the service bulletin was not error.

### (3) *Dealer's Disclaimer of Warranty*

Gordon Harper argues that it is not liable because of a disclaimer contained in its printed bill of sale which reads:

> It is agreed that this merchandise is purchased by me/us subject to the manufacturer's guarantee and it is the only guarantee either expressed or implied, made under this order but does not apply to used merchandise.

It is in the same style of type as the body of the Bill of Sale except that it is slightly smaller. It is the same color as the rest of the type on the document, and is located in the bottom one inch of the document which measures 7½ inches in length and 8½ inches in width. It consists of two lines of type that are coupled

with three additional lines of type relating to other subject matter.

Section 8.2-316(2) provides that language excluding the implied warranty of merchantability must mention merchantability and, if in writing, be conspicuous. It further requires an exclusion of an implied warranty of fitness to be both in writing and conspicuous. Va. Code Section 8.2-316 (1965).

One of the exceptions to this rule is the use of "expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." Va. Code Section 8.2-316(3)(a) (1965). This exception is "merely a particularization" of the broader exception providing for exclusion or modification of implied warranties by usage of trade. Va. Code § 8.2-316 (1965) (Comment 7).

There is no evidence or authority to suggest that the language used on the defendant's Bill of Sale had by usage of trade acquired a common understanding calling the buyer's attention to the exclusion of warranties as well as making it plain that there were no implied warranties. Thus, the provisions of Section 8.2-316(2) are applicable and the language of the exclusion must mention merchantability and must also be conspicuous.

The word, "conspicuous," is defined:

A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals. . . is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous." Whether a term or clause is "conspicuous" or not is for decision by the court. Va. Code § 8.1-201(10) (1965).

The language in the Bill of Sale was not larger nor was it in contrasting type or color from the language in the rest of the body of the form. In fact it was slightly smaller than the other language and exactly the same size as that immediately surrounding it at the bottom of the page. The language was not, therefore, conspicuous in accordance with this definition.

The attempted exclusion was not conspicuous and it did not mention merchantability as required by Section 8.2-316. Therefore, the defendant, Gordon Harper, cannot rely on it as a defense.

The defendants' motions to set aside the jury's verdicts should be denied.